**ADDISON INTERNATIONAL, INC.,
Petitioner–Appellant,**

**v.**

**COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.**

**No. 89–1003.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 15, 1989.

Decided Oct. 10, 1989.

Rehearing Denied Nov. 6, 1989.

Joseph M. Persinger, New York City, F. David Lake, Jr., Wilmer, Cutler & Pickering, Washington, D.C., Timothy G. Reaume, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, Mich., Michael D. Horlick (argued), Venice, Fla., for petitioner-appellant.

Peter K. Scott, I.R.S., Gary R. Allen, Acting Chief, Robert A. Bernstein, Michael J. Roach (argued), U.S. Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before KEITH and MARTIN, Circuit Judges; ENGEL, Senior Circuit Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

Addison International appeals the tax court's two-part decision in *Addison International, Inc. v. Commissioner,* 90 T.C. 1207 (1988), holding (1) that Addison International failed to qualify as a Domestic International Sales Corporation under §§ 991–997 of the Internal Revenue Code (1954) for the taxable year of 1977, and (2) that Addison International was the proper taxpayer with respect to current income earned for the taxable year of 1977. We affirm the tax court on both issues.

■ We review do novo the legal standard applied by the tax court in determining whether Addison International failed to qualify as a Domestic International Sales Corporation and whether it was the proper legal taxable entity. *Humana Inc. v. Commissioner,* 881 F.2d 247, 250–51 (6th Cir. July 27, 1989); *Rose v. Commissioner,* 868 F.2d 851 (6th Cir.1989). The tax court's findings of fact shall not be overturned unless clearly erroneous. *Humana,* at 250–51; *Rose,* 868 F.2d at 853.

Addison Products Company, which manufactures heating and air conditioning equipment for commercial and residential use, incorporated Addison International as a Domestic International Sales Corporation in accordance with Internal Revenue Code §§ 991–97 (1954) for the sole purpose of receiving the tax deferral benefits available to a Domestic International Sales Corporation under the statute.[1] On October 1,

---

* The Honorable Albert J. Engel became Senior Circuit Judge on October 1, 1989.

1. The Domestic International Sales Corporation provisions were enacted by Congress in 1971 to provide tax deferral for that portion of income earned by United States corporations from the sale or lease of domestic products to foreign buyers and lessees. Generally, a corporation that qualifies as a Domestic International Sales Corporation is not taxed on its profit. Internal Revenue Code §§ 991 and 995(a). Approximately half of the profit of a Domestic International Sales Corporation is taxed as a constructive distribution to the shareholders, whether or not such distribution actually occurs. Taxation

on the remaining half is deferred. Internal Revenue Code § 995(b). Any distributions made by the Domestic International Sales Corporation to its shareholders out of previously untaxed earnings and profits are taxable to the shareholders of the Domestic International Sales Corporation. The retained earnings and profit of a Domestic International Sales Corporation that are not taxed currently remain exempt from taxation until they are actually distributed to the shareholders. Internal Revenue Code §§ 996(a)(1), 995(c) and 995(b)(2). Subject to certain restrictions, a Domestic International Sales Corporation is allowed to transfer

1973, Addison Products Company executed an agreement with Addison International in which Addison International promised to conduct its business at all times and in accordance with the statutory provisions of the Internal Revenue Code in order to insure its status as a Domestic International Sales Corporation. In return, Addison Products Corporation granted a franchise to Addison International with respect to all qualified export property sold for use outside the United States and Puerto Rico. Addison Products Corporation agreed to be responsible for the solicitation and satisfaction of orders and agreed to pay Addison International the maximum amount allowable as a commission.

On November 30, 1973, Addison International elected Domestic International Sales Corporation status and Addison Products Corporation simultaneously filed its consent to the election. Throughout 1976 and 1977, the years in issue, Addison International maintained a separate bank account at the Detroit Bank and Trust Company and kept separate corporate books and records as required under the Michigan statutes governing corporations. Addison International had no other assets and no separate employees and maintained no office or facilities separate from those owned by Addison Products Corporation. Except for services relating to qualification as a Domestic International Sales Corporation, Addison International performed no services for Addison Products Corporation or anyone else, nor did Addison International request the performance of services from Addison Products Corporation or anyone else. Addison International did not ship goods under its own name and did not issue documents of title or invoices. However, Addison International's shareholders and officers did hold annual meetings as required under Michigan corporate law.

In organizing and operating Addison International, the officers and directors utilized the "DISC Handbook for Exporters", issued by the Treasury Department in January of 1972 and explaining how to conduct the affairs of a Domestic International Sales Corporation in such a way as to insure Domestic International Sales Corporation qualification.

During the taxable years of 1976 and 1977, Addison International computed its income under the methods prescribed for Domestic International Sales Corporations under the Internal Revenue Code.[2] Addison International computed its income for the taxable year 1976 under the 50/50 method in accordance with Treas.Reg. § 1.994–1(a) (1954), resulting in income in the amount of $2,185,016, and under the 4% method, as prescribed in Treas.Reg. § 1.994–1 (1954), resulting in income in the amount of $4,730. These amounts were paid by Addison Products Corporation to Addison International as commissions resulting in total commission income of $2,189,746. Income for the taxable year 1977 was computed using the 50/50 method and the 4% method resulting in a total commission income of $2,313,141. In addition to the commission income reported for taxable years 1976 and 1977, Addison International reported interest income derived from a producer's loan in the amount of $108,591 and $125,626, respectively. Thus, Addison International reported total taxable income for the years in issue in the amounts of $2,292,881 and $2,438,757, respectively.

Addison Products Corporation claimed commission expense deductions attributa-

additional funds to shareholders in the form of a "producer's loan."

**2.** The income computation methods prescribed by Treas.Reg. § 1.994–1 (1954) relate to the proper allocation of income between related entities. Under the 50/50 method the price charged by the parent corporation to the Domestic International Sales Corporation for the export of products may be set at a price which allows the Domestic International Sales Corporation to obtain taxable income up to 50% of the combined taxable income of the parent corporation and the Domestic International Sales Corporation plus 10% of the export promotion expenses. The 4% method allows the parent corporation to set the price charged to the Domestic International Sales Corporation for the exported products at 4% of the qualified export receipts plus 10% of the export promotion expenses incurred by the Domestic International Sales Corporation.

ble to the commissions paid to Addison International for the taxable years of 1976 and 1977. However, the money was not actually paid to Addison International by the close of Addison International's taxable year. On October 19, 1977, Addison Products Corporation issued a check to Addison International in payment of the commission owing for the taxable year of 1976. Addison Products Corporation made the payment at this time in accordance with its practice of paying Addison International at or about the time the Domestic International Sales Corporation filed its tax returns.[3] The next day Addison International made a producer's loan back to Addison Products Corporation in the amount of $1,141,400. The remainder of the commission payment, in the amount of $1,048,346, was distributed by Addison International to Addison Products Corporation as previously taxed income. On March 21, 1978, Addison Products Corporation issued a check in the amount of $2,324,840 to Addison International in payment of the commissions and interest owing for the taxable year of 1977. Of this amount, Addison International made an advance payment for a producer's loan back to Addison Products Corporation in the amount of $979,112 and made distribution of the remainder to Addison Products Corporation in the amount of $1,345,-728. Addison International's only other expenditures for the taxable years of 1976 and 1977 were payments for Michigan franchise taxes.

In March 1978, independent auditors informed Addison Product Corporation's officers and directors that they had failed to follow one of the procedures required to qualify Addison International as a Domestic International Sales Corporation. Specif-

ically, the memorandum from the auditors advised that Treas.Reg. §§ 1.993–2(d)(2) and 1.994–1(e)(3) (1954) were no longer in proposed form but had been promulgated into final form. These regulations required, among other things, that the commission payment made by a related supplier, i.e. Addison Products Corporation, to a Domestic International Sales Corporation, i.e. Addison International, had to be paid within the 60 days following the close of a Domestic International Sales Corporation's taxable year. The 60–day payment rule had not been included in the handbook relied upon by the officers and directors of Addison International. However, immediately upon learning of the change, Addison Products Corporation made the required payment on March 21, 1978.

The Commissioner issued a timely notice of deficiency to Addison International for the taxable years of 1976 and 1977 on December 15, 1981. The Commissioner did not issue a notice of deficiency to Addison Products Corporation. The statute of limitations with respect to Addison Products Corporation for taxable years 1976 and 1977 expired at midnight on June 30, 1982.

In its notice of deficiency to Addison International, the Commissioner determined that the commissions paid by Addison Products Corporation and reported by Addison International in the taxable years 1976 and 1977 did not constitute qualified export assets as required by the regulations governing a Domestic International Sales Corporation. The amounts had not been paid by Addison Products Corporation to Addison International within 60 days after the close of each taxable year.[4] The

---

**3.** Under Internal Revenue Code § 6072(b) (1954), a Domestic International Sales Corporation's tax returns are due on or before the 15th day of the 9th month following the close of its taxable year.

**4.** In order to qualify as a Domestic International Sales Corporation, at least 95% of the adjusted basis of all assets of the corporation, measured on the last day of the taxable year, must be qualified export assets. Internal Revenue Code § 992(a)(1)(B). The term "qualified export asset," as defined in Internal Revenue Code § 993(b), includes accounts receivables. Inter-

nal Revenue Code §§ 1.993–2(a)(3) and 1.993–2(d)(2) (1954) provide generally that a Domestic International Sales Corporation's accounts receivable will be qualified export assets if the receivables arise as commissions earned by a commission international sales corporation. All parties agree that Addison International was a commission Domestic International Sales Corporation.

Where the domestic parent corporation of the commission Domestic International Sales Corporation is a "related supplier" of the Domestic International Sales Corporation, the circum-

Commissioner, therefore, determined that Addison International did not qualify as a Domestic International Sales Corporation under Internal Revenue Code § 992 (1954) in the taxable years of 1976 and 1977. The Commissioner allocated the income and expenses to Addison International itself rather than to Addison Products Corporation.

■ We believe the tax court correctly held that Addison International was not liable for a deficiency for the year 1976 because it was entitled to rely on the handbook issued by the Treasury Department which made no reference to the requirement that Addison Products Corporation pay any commission to Addison International within 60 days of the close of Addison International's taxable year. As the tax court noted, the handbook itself contained language stating that "the Internal Revenue Service will follow the rules and procedures set forth in this part until such time as they may be modified in regulations or other Treasury publications. Any such modifications which may be adverse to the taxpayers will apply prospectively only." "DISC: A Handbook for Exporters," U.S. Department of the Treasury, January, 1972 at 10. The tax court correctly reasoned that because the handbook clearly promised that adverse treatment would not be retroactively applied, Addison International could maintain that it justifiably relied on the handbook immunizing it

from retroactive application of the 60–day payment rule. Accordingly, Treas.Reg. §§ 1.993–2(d)(3) and 1.994–1(e)(3), which had not been promulgated in final form until October 14, 1977, could not be retroactively applied to Addison International. For the taxable year of 1976, Addison International still qualified as a Domestic International Sales Corporation. *See LeCroy Research Systems Corp. v. Commissioner*, 751 F.2d 123 (2d Cir.1984) (where the Second Circuit held that the very nature of the Domestic International Sales Corporation provisions, which attempted to induce export activity by promises of tax benefits, purposefully elicited taxpayer reliance and it was an abuse of discretion for the Secretary to ignore such promises when they succeeded in eliciting the desired behavior); *Gehl Co. v. Commissioner*, 795 F.2d 1324 (7th Cir.1986); *but see CWT Farms v. Commissioner*, 755 F.2d 790 (11th Cir. 1985) (where the Eleventh Circuit held that government publications did not bind the Commissioner regardless of the promises they contained and retroactively applied and proposed 60–day rule to a Domestic International Sales Corporation whose parent corporation had failed to pay the commissioners within the 60–day period stating that the taxpayer's wisest course should have been to comply with the regulation's requirements even before their enactment in final form). With regard to taxable year

stances under which commissions receivable are treated as qualifying export assets are restricted by the regulations. A "related supplier" is a person or corporation who is owned or controlled by the same parties who own or control the Domestic International Sales Corporation and deals individually with a Domestic International Sales Corporation in a transaction which is controlled by Internal Revenue Code § 994. Internal Revenue Code § 994 includes a transaction in which the Domestic International Sales Corporation is a commission agent for the related supplier on sales of export property to third parties such as the transactions between Addison Products Corporation and Addison International. Treas.Reg. § 1.994–1(a)(3)(b)(1). In such a case, the amount of commissions receivable that qualify as qualified export assets for each tax year must be paid by the parent corporation to the Domestic International Sales Corporation within 60 days after the close of the Domestic International Sales Corporation's taxable year. Treas.Reg. § 1.994–1(e)(3)(i) (1954).

Since Addison Products Corporation was a related supplier with respect to Addison International, Addison International's commissions receivable from Addison Products Corporation had to be paid within 60 days following the close of Addison International's taxable year in order for such commissions receivable to constitute trade receivables and, accordingly, to constitute qualified export assets under Treas.Reg. § 1.993–2(d)(2) (1954). It is undisputed that Addison Products corporation did not pay the commissions it owed to Addison International within the 60 days following the close of Addison International's taxable years in 1976 and 1977. Therefore, under the regulations, the commissions owed for the taxable years 1976 and 1977 did not constitute qualified export assets. Addison International did not qualify as a Domestic International Sales Corporation for 1976 and 1977 because less than 95% of the basis of its total assets was attributable to qualified export assets.

1976, we agree with the tax court and follow the more rational reasoning of *LeCroy Research.* The reasoning of *LeCroy Research* only supports an exception for 1976, however, and offers no support for Addison International's failure to comply with regulations for 1977.

■■■ For the taxable year of 1977, the tax court found that the commission payment by Addison Products Corporation to Addison International was made on March 21, 1978 after the 60–day payment rule had been promulgated into the final form in Treas.Reg. § 1.994–1(e)(3). The tax court held that Addison Products Corporation and Addison International were aware or should have been aware of Treas.Reg. § 1.993–2(d)(2) which applied the 60–day payment rule to the accounts receivable from commissions to Domestic International Sales Corporations. Therefore, for the taxable year of 1977, Addison Products could not justifiably rely upon the handbook in the face of modification by final rulings made before commission payments by Addison Products to Addison International in March of 1978.[5]

The legislative history and the statutory framework governing Domestic International Sales Corporations supports the tax court's second major holding that Addison International was the proper taxpayer on the income which resulted from Addison International's disqualification as a Domestic International Sales Corporation in the taxable year of 1977.

The regulations governing a Domestic International Sales Corporation distinguish between three different types of Domestic International Sales Corporation income. A Domestic International Sales Corporation can have "previously taxed income," "accumulated income," and "other earnings and

profits." Treas.Reg. § 1.996–3(a). Generally, accumulated income is taxed when actually distributed to shareholders while previously taxed income is taxed at the time it is deemed to have been distributed at the close of the Domestic International Sales Corporation's taxable year. Other earnings and profits are defined as being income which falls into neither of the two other categories. Treas.Reg. § 1.996–3(d). In examining the legislative history, reference to a Domestic International Sales Corporation's "other earnings and profits," indicates that a disqualified Domestic International Sales Corporation should still be treated as a separate corporate entity for the purpose of taxing its "other earnings and profits." As the tax court noted:

> The third division of a [Domestic International Sales Corporation] DISC's earnings and profits, is referred to as "other earnings and profits." This has reference to those earnings and profits of a DISC which where accumulated while the corporation was not taxed as a DISC (i.e., in a year prior to the corporation's election, or subsequent to the election if it did not qualify for the year). These are the "normal" earnings and profits of an ordinary corporation which never was a DISC. As a result, these earnings and profits when distributed are eligible for the dividends received deduction and are not treated as foreign source income. S.Rept. 92–437, 1972 C.B. 559, 628.

Congress intended that a Domestic International Sales Corporation should be treated as a separate entity and current "other earnings income" which was not "previous taxed income" or "accumulated income" should be taxed to the Domestic International Sales Corporation. As the tax court noted, to hold otherwise would, in effect,

---

**5.** Under the authority of *Gehl Co. v. Commissioner,* 795 F.2d at 1331 and *Thomas International Ltd. v. United States,* 773 F.2d 300, 305 (Fed.Cir.1985), the tax court correctly rejected Addison International's argument that the payments, although late, were sufficiently timely to constitute substantial compliance with the regulations in issue for the tax year of 1977.

The tax court also correctly rejected Addison International's argument that it should not be disqualified as a Domestic International Sales

Corporation as the 60–day payment regulation was invalid because the Commissioner lacked the authority to issue the regulation. The question has been considered on several prior occasions and the regulations were consistently upheld as presenting a proper exercise of the Secretary's authority. *Gehl Co. v. Commissioner,* 795 F.2d 1324 (7th Cir.1986); *CWT Farms, Inc. v. Commissioner,* 755 F.2d 790 (11th Cir.1985); *LeCroy Research Systems Corp. v. Commissioner,* 751 F.2d 123 (2d Cir.1984).

be calling a Domestic International Sales Corporation a sham corporation and undermine the purpose of Congress in creating an exception to the tax laws through the Domestic International Sales Corporation legislation to encourage international trade by companies such as Addison Products so as to produce a balance between imports and exports.

The dissenting members of the tax court argue that Addison International, as a disqualified Domestic International Sales Corporation, is a sham corporation and cannot be treated as a separate taxable corporate entity. Once Addison International loses the protection of the statute through disqualification, the only reason for the existence of Addison International is tax avoidance which is not a proper business purpose necessary to establish itself as a separate corporate entity under *Moline Properties v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). We disagree with the dissent. The dissent ignores the intent of Congress. Congress has evidenced its clear intent that a Domestic International Sales Corporation be organized as a separate corporate entity for the express purpose of permitting tax deferral benefits. Even part from the clear mandate of Congress in this case, as long as the record contains no evidence or fraud or a purpose prohibited by law, which this record does not, under *Moline Properties* we must treat Addison International as a separate entity. *Humana,* at 254–55. In this case, the Commissioner chose to pursue Addison International for taxes due rather than Addison Products, a clearly allowed statutory choice as both are separate taxable corporate entities. Only one taxpayer is liable, not both.

■ The statutory framework also supports the tax court's conclusion that Congress clearly contemplated the continued corporate status of a disqualified Domestic International Sales Corporation and did not intend to disregard it as if it were a mere shell corporation. Congress prescribed rules regulating the tax treatment of a disqualified Domestic International Sales Corporation in several of the sections of the statute. For example, upon disqualification, a Domestic International Sales Corporation becomes a "former Domestic International Sales Corporation." Internal Revenue Code § 995 provides that upon disqualification, the former Domestic International Sales Corporation's accumulated income is taxable to the Domestic International Sales Corporation shareholders. Internal Revenue Code § 995(b)(2)(A). The accumulated income is distributed to the shareholders over a period of up to ten years. Treas.Reg. § 1.995–3(b). Further, a taxpayer's election to be treated as a Domestic International Sales Corporation remains in effect unless the taxpayer revoked the election or it was disqualified for five consecutive years. Thus, an inadvertent disqualification does not terminate the election. Such a disqualification will prevent the taxpayer from enjoying the benefits of tax deferral in the year of the disqualification but it will not remove its separate corporate status.

■ Therefore, from the legislative history and the statutory framework of the Internal Revenue Code provisions dealing with Domestic International Sales Corporation, we conclude that Congress intended to treat a former Domestic International Sales Corporation such as Addison International as a corporate entity separate from its parent. Thus, the tax court majority correctly held that a disqualified Domestic International Sales Corporation was meant to be taxed as a separate corporation on any income which was neither previously taxed income nor accumulated income, neither of which were the commissions paid by Addison Products Corporation to Addison International. The current income of a disqualified Domestic International Sales Corporation such as Addison International was taxable to the Domestic International Sales Corporation itself and the dividends, when paid to the shareholders, qualified for the dividends received deduction.

For the reasons stated above, we affirm the decision of the tax court.