T.C. Memo. 2015-119

UNITED STATES TAX COURT

SUMMA HOLDINGS, INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.   26476-12, 756-13,          Filed June 29, 2015.
                759-13, 777-13,
                779-13.

Neal J. Block, Robert S. Walton, John T. Bender, and Rebecca Lock, for
petitioners.

John Q. Walsh, Jr., Sarah S. Sandusky, and Peter N. Scharff, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  James
Benenson III and Clement Chambers Benenson Trust, James Benenson, Jr.,
Fiduciary, docket No. 756-13; Clement C. Benenson, docket No. 759-13; James
Benenson, Jr., and Sharen Benenson, docket No. 777-13; and James Benenson III,
docket No. 779-13.

[*2]                    MEMORANDUM OPINION

KERRIGAN, Judge:  These consolidated cases are before the Court on respondent's motion for partial summary judgment and petitioners' cross-motion for summary judgment.  In respondent's motion for partial summary judgment respondent contends that payments made by petitioner Summa Holdings, Inc. (Summa), and its consolidated subsidiaries to JC Export, Inc. (JC Export), during 2008 were not domestic international sales corporation (DISC) commission payments but dividends to Summa's shareholders followed by contributions to Roth individual retirement accounts (Roth IRAs).  In their cross-motion for summary judgment petitioners contend that respondent may not recharacterize the DISC commission payments in this manner and that, as a result, Summa is not liable for the income tax deficiencies and penalties under section 6662A or 6662 that respondent determined for the tax year ending April 30, 2008.  Petitioner Summa also contends that if its position regarding the character of the payments is upheld, the other petitioners in these cases are also entitled to summary judgment.

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the tax years at issue, and all Rule references

**[\*3]** are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

## Background

Some of the facts are stipulated and are so found. Petitioner Summa was a C corporation incorporated in Delaware with its principal place of business in Ohio when its petition was filed. Petitioners James Benenson, Jr. (James Jr.), and Sharen Benenson (Sharen), husband and wife, resided in New York when their petition was filed. Petitioners Clement C. Benenson (Clement) and James Benenson III (James III), resided in Massachusetts when their petitions were filed. James Jr. and Sharen were the trustees of petitioner James Benenson III and Clement Chambers Benenson Trust (Benenson Trust) when its petition was filed.

### The Benenson Family and the Benenson Trust

James Jr. and Sharen are the parents of Clement and James III. The Benenson Trust was established in 1983. James Jr. and Sharen were named the trustees of the Benenson Trust, and Clement and James III were named the beneficiaries of the Benenson Trust. From 2000 to 2008 no portion of the Benenson Trust's principal or income was paid to James Jr. or Sharen.

**[*4]** <u>The Roth IRAs</u>

In 2001 James III established a Roth IRA (James III IRA) and transferred $3,500 to it.[2]  James III made no additional contributions through 2008.  In 2001 Clement established a Roth IRA (Clement IRA) and transferred $3,500 to it.[3]  Clement made no additional contributions through 2008.

<u>JC Export and JC Holding</u>

On January 31, 2002, the James III IRA and the Clement IRA (collectively, Benenson Roth IRAs) each purchased 1,500 shares of stock in JC Export, a Delaware corporation, in exchange for $1,500.  JC Export filed a Form 4876-A, Election to be Treated as an Interest Charge DISC (DISC election).  The DISC election became effective for the tax year beginning January 1, 2002.  From its inception through 2008 JC Export's board of directors consisted of James Jr., James III, Clement, and John V. Curci.

---

[2]We may disregard a stipulation of fact when the stipulation is clearly contrary to facts disclosed by the record.  <u>Cal-Maine Foods, Inc. v. Commissioner</u>, 93 T.C. 181, 195 (1989).  The parties stipulated that James III is the beneficiary of the James III IRA; however, the attached exhibits indicate that Clement is the primary beneficiary of the James III IRA.  We will follow the exhibits.

[3]<u>See</u> <u>supra</u> note 2.  The parties stipulated that Clement is the beneficiary of the Clement IRA; however, the attached exhibits indicate that James III is the primary beneficiary of the Clement IRA.  We will follow the exhibits.

[*5]   On January 31, 2002, the Benenson Roth IRAs each transferred 1,500 shares of JC Export stock to JC Export Holding, Inc. (JC Holding), a Delaware corporation, for 1,500 shares of JC Holding stock.  JC Holding, a C corporation, was incorporated on January 31, 2002.  From January 31, 2002, through December 31, 2008, JC Export was wholly owned by JC Holding, which was owned 50% by the James III IRA and 50% by the Clement IRA.  From its inception through 2008 JC Holding's board of directors consisted of James Jr., James III, Clement, and Mr. Curci.

JC Holding was organized, in part, so that the Benenson Roth IRAs would not have unrelated business income and the associated tax reporting obligations and, in part, so that the custodians of the Benenson Roth IRAs would no longer be involved as shareholders of JC Export and, thus, would avoid being required to take shareholder actions regarding JC Export.

Summa

James Jr. founded Summa in 1983.[4]  Summa is a fiscal year taxpayer with a tax year that ends April 30.  Summa is the parent corporation of a consolidated group of manufacturing companies that make a wide variety of industrial products.  Summa's subsidiaries include:  Vesper Corp., All Star Bleachers, Inc., All Star

---

[4]At the time Summa was known as Arrowhead Holdings Corp.

[*6] Manufacturing, Inc., Arrowhead Products Corp., Bijur Lubricating Corp., Cleveland Gear Co., Inc., Columbia Gear Corp., Farval Lubrication Systems, Inc., Hellan Strainer Co., Lubesite Systems, Inc., Milwaukee Machine Works, Inc., and Penco Products, Inc. (collectively, Summa subsidiaries).

From January 1 to December 29, 2008, Summa had 9,257,004 outstanding shares of common stock.  James Jr. owned 2,146,036 common shares, the Benenson Trust owned 7,039,506 common shares, Industrial Manufacturing Co., LLC, owned 71,431 common shares, and Clement owned 31 common shares.  On December 30, 2008, James Jr. redeemed 1,800,000 common shares.  From 2001 to 2008 James Jr. had the power to direct Summa's operations, including the transfer of its funds.  In 2008 Summa had 12 outstanding shares of preferred stock.  James Jr. owned 8 preferred shares, Clement owned 2 preferred shares, and James III owned 2 preferred shares.

The Transactions

In 2002 the Summa subsidiaries and JC Export entered into a series of agreements.  Pursuant to these agreements the Summa subsidiaries paid JC Export $129,791, $672,048, $625,438, and $810,646 on January 18, April 23, July 25,

**[*7]** and December 22, 2008, respectively.[5] Summa also paid $1,083 of expenses on behalf of JC Export and JC Holding during 2008. The Summa subsidiaries paid JC Export $53,833 on January 23, 2009.[6]

In 2008 JC Export paid $2,237,923 in the form of dividends to JC Holding as follows: $129,791, $672,048, $625,438, and $810,646 on January 18, April 23, July 25, and December 22, 2008, respectively. Each time JC Export received a payment from the Summa subsidiaries it immediately transferred the entire amount of the payment to JC Holding as a dividend. Each time JC Holding received a payment from JC Export it estimated the tax due as a result of the payment, withheld the estimated tax, and immediately transferred as a dividend one-half of the remainder of the payment to each of the Benenson Roth IRAs. Both Benenson Roth IRAs received $42,831, $221,776, $206,394, and $267,513 from JC Holding on January 18, April 23, July 25, and December 22, 2008, respectively. Both Benenson Roth IRAs received $17,765 from JC Holding on January 27, 2009.

---

[5]JC Export reported the $129,791 payment that it received from the Summa subsidiaries on January 18, 2008, as payment of an account receivable that accrued in tax year 2007.

[6]JC Export reported the $53,833 payment that it received from the Summa subsidiaries on January 23, 2009, as payment of an account receivable that accrued in tax year 2008.

**[*8]**  The James III IRA reported on Form 5498, IRA Contribution Information, a yearend fair market value of $3,145,086 for 2008.  The Clement IRA reported on Form 5498 a yearend fair market value of $3,135,236 for 2008.  For tax years 2002-08 JC Export received only the initial $3,000 stock purchase price from the Benenson Roth IRAs and commissions from the Summa consolidated group.

Petitioners' sole reason for entering into the transactions at issue was to transfer money into the Benenson Roth IRAs so that income could accumulate on the assets of the Benenson Roth IRAs and then be distributed tax free.  Petitioners had no nontax business purpose or economic purpose for establishing the Benenson Roth IRAs, JC Export, and JC Holding.  From the organization of JC Export through tax year 2008, JC Export received commissions from the Summa consolidated group that, if treated as contributions to the Benenson Roth IRAs for that year, exceeded the annual contribution limits.

Tax Returns

James Jr. and Sharen filed timely a joint Form 1040, U.S. Individual Income Tax Return, for tax year 2008.  They did not report any dividend distributions on their 2008 Form 1040.

Clement filed timely a Form 1040 for tax year 2008.  He reported $518,722 of gross income on his 2008 Form 1040.  He did not attach a Form 5329,

[*9] Additional Taxes on Qualified Plans (Including IRAs) and Other Tax-Favored Accounts.

James III filed timely a Form 1040 for tax year 2008.  He reported $526,528 of gross income on his 2008 Form 1040.  He did not attach a Form 5329.

The Benenson Trust filed timely a Form 1041, U.S. Income Tax Return for Estates and Trusts, for tax year 2008.  The Benenson Trust did not report any dividend distributions on its 2008 Form 1041.

JC Export filed timely a Form 1120-IC-DISC, Interest Charge Domestic International Sales Corporation Return, for tax year 2008.  It reported $16,508,486 of gross qualified export receipts and $2,161,965 of gross income, which consisted entirely of commission sales.  JC Export also reported $2,161,965 as a dividend distribution.  JC Export reported that it had $129,791 of accounts receivable at the beginning of tax year 2008 and $53,833 of accounts receivable at the end of tax year 2008.  JC Export reported $2,161,965 as taxable income.  On its Schedule K, Shareholder's Statement of IC-DISC Distributions, JC Export reported $2,161,965 as a taxable distribution.

JC Holding filed timely a Form 1120, U.S. Corporation Income Tax Return, for tax year 2008.  JC Holding reported $2,161,965 of gross income, which consisted entirely of dividend income.  It paid income tax on the dividend income

[*10] at the applicable corporate rate. JC Holding reported $1,477,028 of distributions. JC Holding reported that it had $129,791 of accounts receivable at the beginning of tax year 2008 and $53,833 of accounts receivable at the end of tax year 2008.

Summa filed timely Forms 1120 for its taxable years ending April 30, 2008 (2007 tax return), and April 30, 2009 (2008 tax return). On its 2007 tax return Summa reported $380,833,542 of gross sales, $23,709,770 of which was derived from the sale of qualified export property under section 993(c). It claimed a deduction of $2,060,684 for DISC commissions.

On its 2008 tax return Summa reported $368,868,519 of gross sales, $27,710,847 of which was derived from the sale of qualified export property under section 993(c). It claimed a deduction of $2,150,896 for DISC commissions.

Protective Refund Claims

On July 9, 2012, respondent issued JC Holding a letter apprising it of its right to file a protective refund claim for income tax reported on its 2008 Form 1120. In August 2012 JC Holding filed a protective refund claim that changed its total income from $2,161,965 to zero. Also in August 2012 JC Export filed a protective amended 2008 Form 1040 changing its gross income, commission sales, and dividend distributions from $2,161,965 to zero.

[*11] <u>Notices of Deficiency</u>

On October 12, 2012, respondent issued each petitioner a notice of deficiency. In the notices of deficiency respondent determined that the payments that the Summa subsidiaries made to JC Export were, in substance, dividends to Summa's shareholders followed by contributions by the shareholders into the Benenson Roth IRAs. Respondent (1) disallowed the DISC commission deductions that Summa claimed for the payments it made on January 18 and April 23, 2008, and $768 of the deduction for $1,083 of expenses that it paid on behalf of JC Export and JC Holding during 2008; (2) determined that James Jr. received $2,239,006 in dividends from Summa as the sole shareholder of Summa (or in the alternative, that he received $519,002 and the Benenson Trust received $1,702,764 in dividends from Summa on the basis of their respective ownership interests in Summa); and (3) determined that Summa's shareholders contributed $1,119,503 to each of the Benenson Roth IRAs. Since the contributions to the Benenson Roth IRAs exceed the annual contribution limits for Roth IRAs, respondent determined that James III and Clement each had an excise tax deficiency under section 4973 of $67,170 for 2008. Respondent also determined that Summa is liable for a penalty under either section 6662A or 6662 of $56,182 for its taxable year ending on April 30, 2008.

**[*12]**                                        <u>Discussion</u>

I.      <u>Summary Judgment</u>

Full or partial summary judgment may be granted where the pleadings and other materials show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b); <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), <u>aff'd</u>, 17 F.3d 965 (7th Cir. 1994). The burden is on the moving party to demonstrate that there is no genuine dispute as to any material fact and that he or she is entitled to judgment as a matter of law. <u>FPL Grp., Inc. & Subs. v. Commissioner</u>, 116 T.C. 73, 74-75 (2001). Petitioners moved for summary judgment, and respondent moved for partial summary judgment; and the parties agree that there is no genuine dispute as to any material fact. After reviewing the pleadings and the comprehensive stipulation of facts and the attached exhibits, we conclude that a decision may be rendered as a matter of law.

**[\*13]** II.      Statutory Framework

    A.      DISCs[7]

A DISC provides a mechanism for deferral of a portion of the Federal

income tax on income from exports.  The DISC itself is not taxed, but instead the

DISC's shareholders are currently taxed on a portion of the DISC's earnings in the

form of a deemed distribution.  Secs. 991, 995(b)(1).  This allows for deferral of

taxation on the remainder of the DISC's earnings until those earnings are actually

distributed, the shareholders dispose of their DISC stock in a taxable transaction,

or the corporation ceases to qualify as a DISC.  Secs. 995(b)(2), (c), 996(a)(1).

A DISC sometimes does not generate the income it reports on its returns and

might otherwise not be recognized as a corporate entity for tax purposes if it were

---

[7]In the 1980s several European nations complained that the DISC regime constituted an illegal export subsidy in violation of the General Agreement on Tariffs and Trade.  S. Prt. 98-169 (Vol. I), at 635 (Comm. Print 1984).  In response, the United States largely abandoned the DISC regime as part of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 801(a), 98 Stat. at 985.  See Union Carbide Corp. v. Commissioner, 110 T.C. 375, 381 (1998).  DEFRA did not repeal the Code secs. that created the DISC regime but rather created a new entity, the foreign sales corporation (FSC), to serve as a practical replacement for the DISC.  The FSC regime was met with similar criticism, and the Code provisions that created the FSC were repealed by the FSC Repeal and Extraterritorial Income Exclusion Act of 2000, Pub. L. No. 106-519, sec. 2, 114 Stat. at 2423.  The only remaining type of DISC still in use is the interest-charge DISC (IC-DISC), which is governed by Code secs. 991-997.  See generally Ryan L. Losi, "IC-DISCs:  The Last Remaining Export Incentive Just Got Some Staying Power", 86 Prac. Tax Strategies 118 (2011).

**[*14]** not a DISC.  Addison Int'l, Inc. v. Commissioner, 90 T.C. 1207 (1988),

aff'd, 887 F.2d 660 (6th Cir. 1989); Jet Research, Inc. v. Commissioner, T.C.

Memo. 1990-463; see also sec. 1.992-1(a), Income Tax Regs.  "The DISC may be

no more than a shell corporation, which performs no functions other than to

receive commissions on foreign sales made by its parent."  Thomas Int'l Ltd. v.

United States, 773 F.2d 300, 301 (Fed. Cir. 1985); Foley Mach. Co. v.

Commissioner, 91 T.C. 434, 438 (1988); see also Jet Research, Inc. v.

Commissioner, T.C. Memo. 1990-463.

       B.     Excess Contributions to the Roth IRAs and Related Determinations

       1.     Roth IRAs

Congress authorized the Roth IRA, a type of retirement account, with the

enactment of section 408A as part of the Taxpayer Relief Act of 1997, Pub. L. No.

105-34, sec. 302, 111 Stat. at 825.  The distinguishing feature of a Roth IRA is the

back-end timing of the tax benefit:  Contributions to a Roth IRA are not tax

deductible, but all earnings accumulate tax free and all qualified distributions are

tax free.  Sec. 408A(a), (c)(1), (d)(1); Taproot Admin. Servs., Inc. v.

Commissioner, 133 T.C. 202, 206 (2009), aff'd, 679 F.3d 1109 (9th Cir. 2012).

By comparison, contributions to a traditional IRA are deductible and earnings

accrue tax free (except with respect to section 511 unrelated business income), but

[*15] distributions from a traditional IRA are includable in the recipient's gross income.  See secs. 219(a), 408(a), (d)(1), (e).

The Code establishes a maximum aggregate amount that an individual can contribute to all of his or her Roth IRAs for a taxable year, and that amount is phased out between levels of modified adjusted gross income.  See sec. 408A(c)(2) and (3).  Section 4973(a) imposes for each taxable year an excise tax of 6% for excess contributions, computed on the lesser of (1) the amount of the excess contribution, and (2) the value of the account as of the end of the taxable year.  The tax applies each year until the excess contributions are eliminated from the taxpayer's Roth IRA.  See sec. 4973(b)(2).  An excess contribution is defined in part as a contribution to a Roth IRA that exceeds the amount allowable as a contribution.  Sec. 4973(f).  Dividends paid on stock held by a Roth IRA are considered earnings of the Roth IRA itself, rather than contributions by the owner of the Roth IRA, and do not count towards the contribution limits of section 408A. See Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. at 206.

2.    Notice 2004-8, 2004-1 C.B. 333

The Internal Revenue Service (IRS) issued Notice 2004-8, 2004-1 C.B. 333, to address a type of transaction taxpayers are using to avoid Roth IRA contribution limits.  Notice 2004-8, 2004-1 C.B. at 333, states that where a taxpayer's

**[*16]** preexisting business enters into transactions with a corporation owned by the taxpayer's Roth IRA, in certain cases "[t]he acquisition of shares, the transactions or both are not fairly valued and thus have the effect of shifting value into the Roth IRA."  The notice identified three ways in which the IRS would attempt to challenge these transactions:  (1) apply section 482 to allocate income from the corporation to the taxpayer, the preexisting business, or other entities under the control of the taxpayer; (2) assert that under section 408(e)(2)(A) the transaction gives rise to one or more prohibited transactions between a Roth IRA and a disqualified person described in section 4975(e)(2); and (3) assert that the substance of the transaction is that the amount of the value shifted from the preexisting business to the corporation is a payment to the taxpayer, followed by a contribution by the taxpayer to the Roth IRA and a contribution by the Roth IRA to the corporation.

### 3.    Substance Over Form

Generally, the substance and not the form of a transaction determines its tax consequences.  Gregory v. Helvering, 293 U.S. 465, 469-470 (1935); Lazarus v. Commissioner, 58 T.C. 854, 864 (1972), aff'd, 513 F.2d 824 (9th Cir. 1975). Where a series of transactions, taken as a whole, shows either that the transactions themselves are shams or that the transactions have no "purpose, substance, or

[*17] utility apart from their anticipated tax consequences", the transactions are not recognized for Federal tax purposes. Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), aff'g 44 T.C. 284 (1965); see also Commissioner v. Court Holding Co., 324 U.S. 331 (1945).

The Commissioner may challenge the purported tax benefits of a transaction where the underlying substance is demonstrably inconsistent with its form. See Minn. Tea Co. v. Helvering, 302 U.S. 609, 613 (1938). The Supreme Court has "looked to the objective economic realities of a transaction rather than to the particular form the parties employed." Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). The substance over form doctrine applies when the transaction on its face lies outside the plain intent of the statute and respecting the transaction would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose. Gregory v. Helvering, 293 U.S. at 470.

### 4. The Parties' Arguments

Respondent contends that petitioners, through the transactions at issue, shifted value to the Benenson Roth IRAs far in excess of the annual contribution limits. Respondent argues that simply labeling the payments DISC commissions does not immunize the payments from the application of substance over form principles. Respondent further contends that petitioners had no nontax business

[*18] purpose for establishing the Benenson Roth IRAs, JC Export, and JC Holding and petitioners did not received any nontax economic benefits from the transaction at issue.

Petitioners contend that there is no reason to disallow deductions for the commissions paid to the DISC or reclassify the commissions as dividends. Petitioners rely on Hellweg v. Commissioner, T.C. Memo. 2011-58, and argue that the three possible grounds for adjustment pursuant to Notice 2004-8, supra, cannot be applied against them. Petitioners further contend that under Addison Int'l, Inc. and Jet Research, Inc. reclassification of the transaction using substance over form principles is improper because it would result in disregarding DISC transactions.

The instant cases are distinguishable from Hellweg. Like the Commissioner in Hellweg, respondent does not object to the transaction on the basis of section 482 or section 408(c)(2)(A). See Hellweg v. Commissioner, slip op. at 16-17. Respondent contends that the substance of the transaction fails to comport with its form. In Hellweg, the Commissioner argued a variation of the third approach of Notice 2004-8, supra, contending that the transaction lacked substance for excise tax purposes only. Hellweg v. Commissioner, slip op. at 17. The Commissioner did not argue that the transaction was invalid for income tax purposes. Id.; see also Mazzei v. Commissioner, T.C. Memo. 2014-55, slip op. at 9. In Hellweg, we

**[*19]** held that a transaction that is valid for income tax purposes must also be valid for excise tax purposes. Hellweg v. Commissioner, slip op. at 22.

In Hellweg the DISC was indirectly owed by Roth IRAs, which were owned by individuals who held ownership interests in the operating company that paid commissions to the DISC. Id. at 4. In Hellweg the income tax treatment of the transaction was not at issue, id. at 24, but we stated that "in the absence of fraud or an illegal purpose behind the Transaction" the Commissioner could not challenge the substance of the transaction for income tax purposes because to do so would require the DISC to be disregarded, id. at 17. Respondent is not arguing here that the DISC should be disregarded but rather is arguing that a transaction involving a DISC should be recharacterized to prevent an abusive transaction.

Respondent does not disregard JC Export or frustrate the congressional intent behind the DISC provisions. The transaction at issue involves shifting value to Roth IRAs, and one of the business entities involved is a DISC. The choice of the business entity does not affect the substance of the transaction. Under respondent's recharacterization, the purported commission payments in substance did not occur. Respondent is arguing that there were no DISC commission payments made. The existence of JC Export is a distinct issue from

[*20] the issues of whether JC Export engaged in transactions with the Summa consolidated group and if so, what the substance of these transactions was.

The parties stipulated that petitioners' sole reason for entering into the transaction at issue was to transfer money into the Benenson Roth IRAs so that income on assets could accumulate and be distributed tax free. Petitioners had no nontax business purpose for the transactions, nor did they receive any economic benefit from the transactions.

In Repetto v. Commissioner, T.C. Memo. 2012-168, pursuant to Notice 2004-8, supra, we recharacterized service payments made to purported service corporations that were owned by Roth IRAs. We found that the agreements were designed to permit, and did permit, the taxpayer to make excessive contributions to the Roth IRAs through the disguised service payments. Repetto v. Commissioner, slip op. at 30.

In the instant cases, there was a series of transactions shifting value into the Benenson Roth IRAs. These transactions involved a DISC owned by a holding corporation, rather than a service corporation as in Repetto. These transactions, like the transaction in Repetto, were used for the purpose of shifting millions of dollars into Roth IRAs in violation of the statutory contribution limits. In this situation recharacterization under substance over form principles is appropriate.

[*21] In Addison Int'l, Inc. v. Commissioner, 90 T.C. at 1213-1219, a former DISC became disqualified because of a failure to comply with certain DISC technical rules. There was no Roth IRA involved in the transaction. In Addison Int'l, Inc. we did not address the issue of whether the substance over form doctrine is an appropriate remedy when a DISC is used to avoid Roth IRA contribution limits. Id. at 1220-1223. We specifically addressed the treatment of a former DISC and relied on legislative history to reach the conclusion that the current income of a DISC is taxable to the DISC itself and dividends when paid to the shareholders qualify for the dividends received deduction. Id. The instant cases do not involve disqualified DISCs, but involve a DISC that is part of a larger tax avoidance transaction that is not related to a DISC transaction or DISC benefits.

In Jet Research, Inc. v. Commissioner, T.C. Memo. 1990-463, we concluded that reallocation of income of a disqualified DISC to its parent corporation was improper because the DISC carried on substantive business activities. In that case the Commissioner did not apply substance over form principles to recast a transaction that was circumventing a Code provision; rather the Commissioner was looking to see whether the transactions between the operating company and the DISC were done at arm's length. Id. In Jet Research the Commissioner was

**[\*22]** trying to determine which party earned the income at issue. Therefore, <u>Jet Research, Inc.</u> is distinguishable from the instant cases.

The payments that the Summa consolidated group made to JC Export during 2008 were not DISC commissions but deemed dividends to Summa's shareholders followed by contributions to the Benenson Roth IRAs.

III.    <u>Section 995(g)</u>

Petitioners contend that the payment of DISC dividends to a Roth IRA cannot be treated as an excess contribution because Congress specifically addressed the ownership of a DISC by an IRA when it enacted section 995(g). Section 995(g) provides that when a tax-exempt entity that is a shareholder of a DISC is deemed to receive a distribution from a DISC, actually receives a distribution from a DISC of previously untaxed income, or realizes gain from disposition of DISC shares which is treated as a dividend, then that income is treated as derived from the conduct of an unrelated trade or business.

Section 995(g) was enacted to ensure that taxable entities could not shield active business income from tax by assigning DISC stock to controlled tax-exempt entities. H.R. Rept. No. 101-247, at 1425-1426 (1989), 1989 U.S.C.C.A.N. 1906, 2895. Congress amended section 995(g) to clarify that the section is not limited to tax-exempt entities described in section 511(a)(2) and (b)(2) but rather includes

[*23] other tax-exempt entities, such as IRAs, which are subject to taxation on their unrelated business income.

Petitioners argue that since Congress could have prohibited transactions involving DISCs owned by IRAs but chose not to do so, Congress was comfortable with IRAs' holding DISC stock. We rejected this argument in Hellweg. As we stated in Hellweg, this argument is logically erroneous. See Hellweg v. Commissioner, slip op. at 13. Congress' choice to prevent one particular abusive transaction involving DISCs and IRAs does not indicate that Congress approves of all other abusive transactions involving DISCs and IRAs. See id. at 13-14.

Section 995(g) was enacted in 1988, almost 10 years before the enactment of the Roth IRA provisions, which were enacted as part of the Taxpayer Relief Act of 1997, sec. 302. They became effective for tax years beginning after December 31, 1997. Id. sec. 302(f), 111 Stat. at 829. Congress could not have been aware of the type of abusive transaction involving Roth IRAs at issue here at the time of enactment of section 995(g).

IV. Conclusion

For these reasons we hold that the payments to JC Export were not DISC commissions, but rather dividends to Summa's shareholders followed by

**[\*24]** contributions to the Benenson Roth IRAs.  Accordingly, we will grant respondent's motion for partial summary judgment and deny petitioners' motion for summary judgment.

Any contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.